H5NLLONC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    KEYU LONG,

4                    Plaintiff,

5              v.                          17 CV 2613 (KPF)

6    AMWAY CORP.,

7                    Defendant.

8    ------------------------------x
                                          New York, N.Y.
9                                         May 23, 2017
                                          4:03 p.m.
10
     Before:
11
                     HON. KATHERINE POLK FAILLA,
12
                                          District Judge
13
                            APPEARANCES
14
     LOUIS J. MAIONE
15        Attorney for Plaintiff

16   MORRISON & FOERSTER LLP
          Attorneys for Defendant
17   BY:  DAVID J. FIOCCOLA
          ADAM J. HUNT
18

19

20

21

22

23

24

25

H5NLLONC

1          (Case called; appearances taken)

2          THE COURT:  From the folks at the back table, is there

3   one of you in particular to whom I should be directing my

4   questions?

5          MR. FIOCCOLA:  Probably me, your Honor, David

6   Fioccola.

7          THE COURT:  Thank you.  I will do that.  You're

8   welcome to sit down, except for you, Mr. Maione, because I want

9   to understand a little bit more about the case.

10          Could you tell me, please, because I'm not sure I

11   understand it fully from the pleadings, how your client came to

12   find this opportunity and sign this particular contract because

13   it was done online.  Correct?

14          MR. MAIONE:  That's correct, your Honor.

15          THE COURT:  Okay.  Is it a situation where she was on

16   the internet looking at business opportunities?

17          MR. MAIONE:  My understanding is that she was

18   introduced to the Amway products and the sale of Amway through

19   another Chinese friend, another Asian friend, and went to the

20   website and that's how she signed up.

21          THE COURT:  And as I'm understanding what you're

22   saying in your submissions, Amway does have these contracts in

23   other languages but not on the online version.  That's only in

24   English.

25          MR. MAIONE:  That's my understanding.  Not only in

H5NLLONC

1     English, in Spanish.

2             THE COURT:  English and Spanish.

3             MR. MAIONE:  Spanish.

4             THE COURT:  And your client speaks Mandarin?

5             MR. MAIONE:  To tell you the truth, your Honor, I do

6     not know what dialect she speaks.  But when I met her five

7     years ago for the first time, she did not speak -- well, she

8     spoke some English.

9             THE COURT:  Okay.  You raise an interesting issue.

10    You met with her five years ago.  This complaint was

11    obviously --

12            MR. MAIONE:  I've represented both she and her husband

13    on other matters.

14            THE COURT:  Other matters.  Okay.  Ever have any

15    problems communicating with her?

16            MR. MAIONE:  A bit in the beginning.

17            THE COURT:  Okay.  Why I ask, sir, is for my parents,

18    English is their one and only language, but asking them to

19    interpret contract provisions, it's not a question of their

20    fluency in a particular language, it's the fact that they're

21    not lawyers.

22            So your argument is -- I want to make sure I get this

23    correct -- is it that only the arbitration provision is

24    unconscionable, or the entire agreement is unconscionable, or

25    having someone who is not a native English speaker sign this or

H5NLLONC

1   the Spanish equivalent of it, what's procedurally

2   unconscionable?

3          MR. MAIONE:  I think it's procedurally unconscionable,

4   your Honor, as to the relationship between Asians, like my

5   client, who are not in equal bargaining power with Amway, in

6   addition to the fact that they did not understand the contract

7   at all.  The substantive issue is the ADR procedures

8   themselves.  There are three different procedures.  They all

9   take place up in Michigan.  They don't get the issues resolved,

10  they're all at the expense of the potential plaintiffs.  And as

11  I stated in my letter, although it was the Ninth Circuit

12  interpreted the provisions of the contract under California

13  law, there have been two cases where the courts have come down

14  and said that the contract is both procedurally and

15  substantively unconscionable.

16         THE COURT:  Are you saying that the very terms that

17  were addressed in the *Pokorny* case, and I'm not sure I know

18  what the other one is, it's the exact same set of provisions

19  implicated in this case?

20         MR. MAIONE:  Almost to a tee, yes.

21         THE COURT:  I see.  All right.

22         MR. MAIONE:  And just to add, your Honor, there are

23  several other potential plaintiffs who speak -- I didn't put

24  them in this complaint because I thought that the better way to

25  approach this was -- I anticipated that I was giving to have to

5

H5NLLONC

1    deal with the issue of whether the defendant was going to try

2    to compel arbitration, and I don't want to take the money from

3    these people if ultimately it was determined that we'd have to

4    arbitrate.  But, for example, the other four or five whom I've

5    met, and I think there are about 70 or so.

6          THE COURT:  Seventy, sir?

7          MR. MAIONE:  Seventy whose bonuses have been withheld.

8    The five that I've met speak no English at all and I've had to

9    deal with them through an interpreter.

10         THE COURT:  They're speaking no English, but did they

11   sign an agreement to be IBOs?

12         MR. MAIONE:  They clicked on it, yes, your Honor.

13         THE COURT:  I see.  They clicked on something they

14   didn't know?

15         MR. MAIONE:  Apparently.

16         THE COURT:  That's curious.  But today you're not

17   bringing a class action.

18         MR. MAIONE:  Not, no.

19         THE COURT:  Not today.  And today you're not seeking

20   to amend to make this a class action.

21         MR. MAIONE:  No, your Honor.  As I said, I thought the

22   better of it because if ultimately we were to lose this issue,

23   I'm going to represent them.  I anticipate representing them in

24   arbitrations if they decide that they want to traipse up to

25   Michigan for three times.  So I thought we'd do it that way.

H5NLLONC

1              THE COURT:  All right.  To be clear, this is both our

2    initial conference and a premotion conference.  From you, in

3    the first instance, I just want to hear about your case and

4    then I'm going to talk to the folks at the back table and then

5    we'll talk more about the unconscionability arguments that

6    you're making.  I want to make sure I understand your claims.

7    And your argument is your client thought she was getting a

8    bonus, but she didn't get a bonus.

9              MR. MAIONE:  That's correct.

10             THE COURT:  And she should have gotten a bonus.

11             MR. MAIONE:  That's correct.

12             THE COURT:  And I want to understand, well, I guess

13   the complaint suggests that there are 75 to a hundred folks who

14   were denied bonuses, all of whom were of Asian extraction,

15   correct?

16             MR. MAIONE:  That's my understanding, yes.  Everyone

17   who hasn't gotten a bonus is Asian.

18             THE COURT:  And I guess I'd like to know how you came

19   to know that because, for example, it may be that folks in the

20   Asian community are talking about not receiving the bonuses

21   and, therefore, you know that this group of people in this

22   community are not receiving bonuses.  But how do you know that

23   there aren't folks in other ethnic --

24             MR. MAIONE:  I don't.

25             THE COURT:  Okay.  So how do you know there's not an

H5NLLONC

1    equal opportunity denial of bonuses?

2              MR. MAIONE:  I don't know that, your Honor.

3              THE COURT:  Okay.  This case is seeking a declarative

4    judgment that the discrimination, by which you mean the failure

5    to pay your client the bonus she believes she was entitled to,

6    was because of her ethnicity.  So I guess what I'm trying to

7    understand is how do we know that folks of Asian extraction are

8    being treated differently from folks of Hispanic extraction or

9    folks of pick any ethnicity you'd like?

10             MR. MAIONE:  That's a good question, your Honor, and I

11   don't really know the answer, but I think it's somewhat

12   apparent that 70 some odd people, all of whom are Asian, have

13   not gotten their bonuses.

14             THE COURT:  And that may be regrettable, but how many

15   IBOs, well, folks at the back table are going to tell me how

16   many there are in this country.  I suspect the answer is a lot.

17             MR. MAIONE:  Yes.

18             THE COURT:  And I guess I would feel a little bit more

19   comfortable about your allegations if, for example, you had

20   some comparators.  If you could say and they are friends with a

21   whole bunch of Latinas who did get their bonuses, but we don't

22   have that.

23             MR. MAIONE:  We don't have that, your Honor.  And I've

24   thought of this -- pardon me for interrupting -- I've thought

25   of this that -- I hate to use the word, but it could be

8

H5NLLONC

1  coincidental insofar as the plaintiff and these other folks

2  that I know seem to operate in fairly closed Asian circles.  So

3  it's possible that these are just a lot of people that they

4  know and they were all deprived of their bonus.  But as you

5  pointed out, your Honor, there could be people of Latino decent

6  who have not gotten bonuses and various different people.  I

7  don't know that.  I imagine we'll be able to find some of that

8  out in discovery, but I don't know the answer to that.

9         THE COURT:  And what reason was given for the denial

10  of the bonus to your client?

11         MR. MAIONE:  That she didn't make her quotas.

12         THE COURT:  And she believes she did?

13         MR. MAIONE:  Yes.

14         THE COURT:  All right.  This was October of 2016;

15  that's when she was advised she wasn't getting her bonus.  Is

16  that correct?

17         MR. MAIONE:  That's correct.

18         THE COURT:  Was that the first time that she had

19  failed to obtain a bonus that she believed she qualified for?

20         MR. MAIONE:  Yes, that's my understanding.  It usually

21  is through the end of the bonus period through the end of

22  August, I believe, and they notified her in October that she

23  wasn't getting the bonus.  The bonus isn't paid in October.

24  It's through October and she usually gets paid in the fall and

25  that's when they found out that they weren't getting paid the

H5NLLONC

```
 1    bonus.

 2              THE COURT:  And could you remind me, please, the size,

 3    generally speaking, ballpark it, please, what kind of bonus are

 4    we talking about?

 5              MR. MAIONE:  Keyu Long's bonus is about $117,000, as

 6    best she can calculate.  The other folks are somewhere between

 7    75 and 125.  And one woman contends that she's somewhere around

 8    250,000.

 9              THE COURT:  Were all of these bonuses denied in or

10    about October of 2016?

11              MR. MAIONE:  Yes, yes, to my understanding, yes.

12              THE COURT:  And prior to that date, sir, there were no

13    bonus issues of which you were made aware?

14              MR. MAIONE:  Not that I was made aware of, no.

15              THE COURT:  Your client didn't have any problems.

16              MR. MAIONE:  Not that I know of, no.  I was not

17    informed of that.  As I said, I represented her husband and her

18    husband's business for a while, and the first time I heard

19    about it was last fall.

20              THE COURT:  And in your discussions with other

21    colleagues of your client, other IBOs, did any of them tell you

22    that they had been wrongfully deprived of bonuses at any point

23    prior to October of 2016?

24              MR. MAIONE:  Not that I can remember your Honor, no.

25              THE COURT:  And recognizing that this is hearsay, did
```

H5NLLONC

```
 1    anyone say to you that someone had been denied a bonus for
 2    years prior to 2016?
 3              MR. MAIONE:  I think the answer to that is no, as
 4    well.  I did not spend a great deal of time with them because I
 5    don't represent them.
 6              THE COURT:  Of course.
 7              MR. MAIONE:  Therefore, I would have an issue.  So
 8    that's kind of where we are at this point.
 9              THE COURT:  Okay.  All right.  Let me talk to the
10    folks at the back table.
11              All right, sir, let's start with the easy question.
12    Do you know why Ms. Long was not given a bonus?
13              MR. FIOCCOLA:  Not yet, your Honor.
14              THE COURT:  I thought that was going to be the easy
15    question.  Okay.  You agree she was not given a bonus?
16              MR. FIOCCOLA:  I would assume.  I don't have reason to
17    think that that's incorrect at this point.  When we were
18    retained, any challenges to the ADR provision, which is a much
19    larger issue to us than the issue of the bonus -- and we can
20    dive into that.  We haven't yet done that because we were
21    focused more on the challenge to the arbitration provision
22    which impacts, you know, a decision in New York obviously
23    invalidating that would have much greater impact beyond this
24    case, which as of right now is not a class action.
25              THE COURT:  Understood.  It was intellectually
```

H5NLLONC

1  stimulating for me but less interesting for you.  Let us talk

2  about the provision that you wish to enforce.

3          MR. FIOCCOLA:  Well, your Honor, just on that one

4  point though, if I may, it's not even entirely clear just from

5  reading the complaint what provision he's claiming is breached

6  or what happened or what the quota was.  So we can factually

7  investigate it on our side, but the complaint itself we think

8  doesn't even have that bare minimum amount of information.

9          THE COURT:  I suspect that if there weren't the

10 arbitration provision that you're asking me to compel

11 enforcement of, you'd be making a 12(b)(6) argument.

12         MR. FIOCCOLA:  That is right.

13         THE COURT:  I understand that.  I am interested in the

14 facts because that's kind of what I do.  But I do understand

15 that you're interested in this issue, the arbitration

16 provision.  So I'll turn to that because that's in part what's

17 bringing us here today.

18         MR. FIOCCOLA:  Sure.

19         THE COURT:  Sir, do you agree with me that the

20 provision in this case is sufficiently broad, is so broad that

21 the question of arbitrability itself is committed to the

22 arbitrator?

23         MR. FIOCCOLA:  We believe that's up to the arbitrator

24 to decide as per the agreement between the parties.  But the

25 way we would address that, your Honor, in briefing is while we

12

H5NLLONC

1    think that the delegation clause does delegate all of these

2    issues to the arbitrator, we would also argue in the

3    alternative that in the event that the Court disagrees with

4    that, we would make the arguments as to the enforceability of

5    the arbitration agreement to the Court.

6            THE COURT:  Sort of my limited investigation of this,

7    which is a couple of hours looking through some cases, is that

8    while this is on the very broadside of arbitration clauses,

9    inasmuch as I'm understanding plaintiff to the challenging not

10   the entirety of the agreement but these provisions of the

11   agreement, I suspect that I am the one charged under Second

12   Circuit law with determining whether or not the agreement, this

13   provision of the agreement is unconscionable.  So I think, I

14   suspect, but if I'm wrong, we'll all figure this out during the

15   briefing process, I think I'd have to make the antecedent

16   determination of whether or not this is unconscionable.  Hence,

17   I'm trying to figure out what is unconscionable.

18           So there is discussion about both procedural and

19   substantive unconscionability.  I'm aware of the *Pokorny* case.

20   We'll put that to the side for a moment, please.  I am aware

21   there is a decision from Judge Caproni, a colleague of mine,

22   from last week -- hot off the presses -- *Qiu v. Jia Xing 39th*

23   *Inc*.  It's an unreported Westlaw decision that I imagine you've

24   seen, but it there speaks to this specific issue of the

25   enforceability of an arbitration provision for someone who

1    claims to be unable to speak English or understand all of its

2    nuances.

3            What I've looked at suggests that there are

4    circumstances where one's comprehension of the English language

5    matters.  For instance, situations where employers are handing

6    out documents to their employees and suggesting that things

7    must be signed or else they're going to immediately be fired or

8    need to get back to work, okay.  This is a little bit different

9    because in theory she selected, was given an opportunity to

10   sign on for this.

11           Is there an opt out provision for Amway's ADR?

12           MR. FIOCCOLA:  I'd need to check, your Honor.  We

13   could check that.

14           THE COURT:  You understand the concept.

15           MR. FIOCCOLA:  Yeah.

16           THE COURT:  Because I just -- I actually can't

17   disclose the other defendant because I haven't yet issued the

18   decision.  But in this other case I have, there's a very

19   specific provision for employment disputes that allows the

20   employee to opt out within let's say 30 days of joining the

21   company.  So if they want out, they can do it.  I didn't know

22   whether there was a similar one.  And for some courts, that

23   particular provision has some force.

24           But just focusing on the procedural, why is this not

25   procedurally unconscionable where it's presented not merely as

H5NLLONC

1    a take it or leave it, but as a click and you're done?

2          MR. FIOCCOLA:  Your Honor, I think there's a lot of

3    good case law in the Second Circuit, and if I can address the

4    *Pokorny* decision as well.

5          THE COURT:  Yes, please.

6          MR. FIOCCOLA:  We think -- and unfortunately we don't

7    get a reply to the plaintiff's letter, so if I can just address

8    some of the issues that he raised.

9          THE COURT:  Yes.

10          MR. FIOCCOLA:  Obviously, they entered into an

11    agreement.  I don't think that there's a dispute.  They're

12    claiming they're entitled to the bonus under the agreement.

13    They alternatively plead unjust enrichment, which we

14    understand.  But I think the Court can accept the fact that

15    there is an agreement between the parties and the issue is

16    whether the arbitration agreement will become valid.

17          So if I could address unconscionability, the

18    plaintiffs make their argument on a 2010 Ninth Circuit

19    decision, the *Pokorny* decision.  That predates, Judge, the *AT&T*

20    *Concepcion* decision from the U.S. Supreme Court.  Also, it's

21    applying Ninth Circuit law, which doesn't apply here.  But more

22    importantly, *Pokorny* is no longer good law.

23          THE COURT:  Because there's a California court

24    decision that invalidated one part of it.

25          MR. FIOCCOLA:  That's right.  The Supreme Court

H5NLLONC

1    decision in June 2014, *Iskanian v. CLS Transportation,* 327 P.3d

2    129.  It held that prior rulings that arbitration clauses and

3    class action waivers were unconscionable prior to *Concepcion*

4    are contrary to U.S. Supreme Court precedent.  And the point is

5    that the state law principle of unconscionability can't

6    override a valid arbitration agreement governed by the FAA.  So

7    the reliance on *Pokorny* and this argument of res judicata we

8    think is no longer applicable here.

9            THE COURT:  Sir, is there in fact substantively

10   identical provisions --

11           MR. FIOCCOLA:  I think they made some refinements to

12   it.  What a lot of companies do is as these issues are

13   litigated, they make adjustments to arbitration provisions.

14           But, Judge, so *Iskanian* was decided in June 2014.  A

15   month later, in July 2014, in a case called *Lei v. Amway*, the

16   Central District of California held that the Amway arbitration

17   provision was valid and enforceable, nearly identical to the

18   provisions here, including the conciliation provision, which is

19   the pre-arbitration dispute mechanism.

20           THE COURT:  But was there an allegation in the *Lei*

21   case that there were difficulties in understanding?

22           MR. FIOCCOLA:  Yes, there were, Judge, and those

23   arguments were rejected.  It's a slip opinion that I have,

24   Judge.  It might be on Lexis.  But we represented them, so I

25   have that if the Court wants a copy of it.

H5NLLONC

1           THE COURT:  Yes, please.

2           MR. FIOCCOLA:  I'm pretty sure, Judge, this is a clean

3   copy.

4           THE COURT:  It's fine.  I won't take offense at your

5   highlights.

6           MR. FIOCCOLA:  Thank you.

7           THE COURT:  Sir, that's all right.  I won't make you

8   sit here while I read it.  Please tell me what you'd like me to

9   know.

10          MR. FIOCCOLA:  Mr. Hunt reminds me that Amway did

11  revise its agreement after *Pokorny*, so it's not exactly the

12  same provision at issue in that case.

13          Lastly, Judge, and you referenced the Southern

14  District decision from last week.  I'd also want to point out,

15  although it's not binding on this Court, but the Court might

16  find the decision persuasive.  We represented Uber

17  Technologies.

18          THE COURT:  Judge Garaufis's decision.

19          MR. FIOCCOLA:  Yes, but also Judge Chen and that was

20  from February of this year where the same arguments were made.

21  It was a New York class action by the drivers.  And the

22  argument was that the app is provided, the Uber app is provided

23  in the Chinese language, but the original agreement to sign up

24  to be an Uber driver was not provided in Chinese.  And the

25  court rejected that largely on the grounds, as the Court

H5NLLONC

1    mentioned, and distinguished those employment cases in that it

2    was something that the plaintiffs had sought out, was an

3    agreement they sought out.  And the judge was weighing the

4    employment opportunities that this company was providing

5    against the argument that they couldn't read the agreement and

6    looking at Second Circuit case law found that if you're going

7    to enter into an agreement, you have on obligation to

8    understand it and they could have it translated.  It wasn't up

9    to the company to necessarily pay for the translation for the

10   plaintiffs.

11            THE COURT:  Could you switch, please, to the issue of

12   substantive unconscionability.  I think what I'm understanding

13   from plaintiff's counsel is that the process itself, the

14   conciliation process and then I guess the arbitration that

15   would follow, are themselves very heavily weighted in favor of

16   Amway because you have to go to Michigan.  The IBO would be

17   bearing the expense of these provisions.  I can look for other

18   things they said, but I think you heard Mr. Maione at the

19   beginning list some things that he felt rendered it

20   substantively unconscionable.  Could you speak to those issues,

21   please.

22            MR. FIOCCOLA:  Judge, I just think we disagree with

23   that and the cases that have interpreted this provision have

24   not found them to be substantive unconscionable.  What I see

25   happen in these cases where location was an issue or cost was

H5NLLONC

an issue, that's not a reason necessarily to invalidate the

provisions because that's something that can be worked out

between the parties.  And it's not something where if that's

what they were going to do, to split the cost or offer to have

the arbitration take place in New York, so I've seen that

happen as well.  But I don't think that it's an agreement --

it's not a one-sided agreement.  When you find the substantive

unconscionability arguments that courts find persuasive is

because it's so one-sided as to be unfair.  And this is not a

situation where one side is picking the sole arbitrator or that

the costs would be so excessive that they can't pursue their

particular claim.

        THE COURT:  What I'm remembering from *Pokorny* is there

is a provision that the arbitrator had to undergo Amway

training or that there would be I guess a difference in whether

the fees would be capped depending on whether the arbitrator

had some experience or training by Amway or another company or

not.  Is that still a thing?

        MR. FIOCCOLA:  One second, your Honor.  I'm going to

check.

        THE COURT:  And if Mr. Hunt would prefer to explain it

to me, that's fine too.

        MR. FIOCCOLA:  Your Honor, I believe it's a neutral

mediator under AAA.

        THE COURT:  Under *Pokorny*, it was JAMS, and it was a

H5NLLONC

1    specially trained arbitrator.

2              MR. FIOCCOLA:  That might have been one of the changes

3    that the company had undertaken after that decision.

4              THE COURT:  Okay.  Am I correct, sir, that if your

5    client wanted to, they could waive the conciliation in the

6    arbitration provisions?

7              MR. FIOCCOLA:  Yes.  I've seen that in cases as well.

8    Usually if the plaintiffs are amenable, those steps can be

9    waived and the parties can go directly to arbitration.

10              THE COURT:  Your client would also be permitted to

11   waive the arbitration provision, yes?

12              MR. FIOCCOLA:  To waive it entirely?

13              THE COURT:  That is what I'm saying, yes.  What I mean

14   by that, sir, is there's no obligation that you participate in

15   arbitration, is there?  If both sides are amenable to having

16   the matter resolved in a court, that can happen, yes?

17              MR. FIOCCOLA:  Usually that's the case.

18              THE COURT:  But here your client wishes not to.  Your

19   client believes that it has the right.  It has these

20   provisions.  It's something for which it bargained in this

21   process, and it wishes to invoke the benefits of that bargain.

22   Correct?

23              MR. FIOCCOLA:  And that the plaintiffs accepted that,

24   your Honor, yes.

25              THE COURT:  I understand.  So there's no persuading

H5NLLONC

1    you to just let this case go forward and to have your 12(b)(6)

2    motion rather than your motion to compel arbitration.

3                MR. FIOCCOLA:  Well, I think that's right, your Honor.

4    If I can recall, they also allege as a cause of action --

5                THE COURT:  Yes.

6                MR. FIOCCOLA:  -- that the provisions should be

7    invalidated and that's something that I think we would have to

8    address even if we went down the 12(b)(6) route.

9                THE COURT:  Right, because I'm being asked for a

10   declaratory judgment.

11               MR. FIOCCOLA:  Exactly, Judge.  And we would prefer to

12   handle this through the FAA and the mechanism set up by the

13   FAA, which has certain appellate rights associated with it, and

14   address that issue first.  And then if that motion is denied,

15   then have the opportunity to respond to the complaint.

16               THE COURT:  This I understand.  Let's go off the

17   record for a moment.

18               (Discussion off the record)

19               THE COURT:  So to be clear, sir, you wish to persist

20   with this motion to compel arbitration?

21               MR. FIOCCOLA:  Yes, your Honor, although I will report

22   the conversation back to our client and the event of today.

23   And I've been in situations where clients decide to withdraw

24   that motion or the request for it.  But as of right now, they

25   want to proceed with the motion to compel arbitration.

H5NLLONC

```
 1          THE COURT:  Okay.  And you can let your client know
 2     I'm not foreshadowing or not portending anything.  I'm just
 3     asking the question.  I'm just a woman concerned about her
 4     docket.
 5          So with that in mind, approximately how much time
 6     would you need for your motion?  I'm looking, I was thinking
 7     about a June 30 filing date, but if someone is going to be
 8     away, you'll have to let me know.
 9          MR. FIOCCOLA:  I think June 30 works, Judge.  I think
10     we have more of an issue with the week of July 4.
11          THE COURT:  Well, okay.
12          MR. FIOCCOLA:  June 30 will work just fine.
13          THE COURT:  And, Mr. Maione, let's hear from you, sir.
14     The 31st of July is a Monday.  Is that enough time for you to
15     respond, sir?
16          MR. MAIONE:  Yes, it is.
17          THE COURT:  Okay, great.  And then comes August.  So
18     as I wreck Mr. Hunt's vacation, which is certainly not my
19     intent, August 14?  Be honest with me.  I don't normally ask
20     about your summer plans.
21          MR. FIOCCOLA:  I plan to be in Italy the first two
22     weeks of August, Judge.  But if you wouldn't mind, if you would
23     just give us an extra week.
24          THE COURT:  The 25th?
25          MR. FIOCCOLA:  That would be great.
```

H5NLLONC

1      THE COURT:  I'll give you until the 25th.  That's more

2  than an extra week, but that's fair.  All right.

3      And then since it is your motion, sir, I'm going to

4  ask you, please, to obtain a transcript of this conference.  If

5  you order it in the ordinary course, I'll receive it in time

6  for all of the briefing in this case.

7      MR. FIOCCOLA:  Perfect.

8      THE COURT:  I will assume that you all want oral

9  argument.  I will ask for it if it's going to be useful, but

10  we'll see what happens.

11      Are there any cases of which you're aware at the

12  Second Circuit right now that would impact the issues here?

13  There is an unconscionability case from the Northern District

14  that is up at the circuit now, Judge Wolford, I believe.  But

15  that was a very different unconscionability issue.  That was

16  substantive and that was because it replaced U.S. law with

17  British Virgin Islands law.  So I don't think that helps me in

18  my analysis.

19      MR. FIOCCOLA:  I don't think so, Judge.  The most

20  recent, other than the one you mentioned from last week, the

21  most recent decisions that we were aware of were Judge Garaufis

22  and Judge Chen's decisions.  But we will in our motion point

23  out to the Court if there is a decision that's on appeal that

24  would be relevant that the Court and the parties should

25  continue to watch.

H5NLLONC

 1          THE COURT:  Okay.  And, Mr. Maione, you heard us talk

 2     about some cases, sir.  We're talking about them as if you know

 3     about them.  Are you aware of these decisions from Judge

 4     Garaufis and Judge Chen?

 5          MR. MAIONE:  No, I'm not, your Honor.

 6          THE COURT:  May I ask the folks at the back table to

 7     give him the information about those cases.

 8          MR. FIOCCOLA:  Absolutely, Judge.

 9          THE COURT:  Because my copies are heavily annotated

10     and I don't want you to see all of my highlighting, so we'll do

11     that.  But there are I guess three or four cases in this

12     calendar year that arguably touch on the issues raised here.

13          MR. MAIONE:  Thank you, your Honor.

14          THE COURT:  Okay.  Anything else to discuss this

15     afternoon?

16          MR. FIOCCOLA:  Just two very brief points.

17          THE COURT:  Yes, sir.

18          MR. FIOCCOLA:  I just wanted to be clear, we'll be

19     moving to compel arbitration, but our time to otherwise respond

20     to the complaint will be held in abeyance until that motion is

21     decided?

22          THE COURT:  That is correct.

23          MR. FIOCCOLA:  And then we do have on the calendar a

24     status conference for June 7.  I wanted to know -- July, sorry.

25     Thank you.  July 7.  I wanted to see if the Court still wanted

H5NLLONC

```
 1   to hold that date.

 2            THE COURT:  No.  I don't think that's necessary.  I

 3   think that was going to be the IPTC in this case and now that

 4   we've had this conference, what we'll do is we're going to

 5   issue a written scheduling order.  If nothing else, it

 6   populates the ECF entries with this information.  In that same

 7   order I'll adjourn sine die the July 7 conference because it

 8   doesn't make sense.

 9            MR. FIOCCOLA:  My point exactly, Judge.

10            THE COURT:  We'll be in the middle of briefing.  That

11   is fine.

12            Sir, anything else today?

13            MR. FIOCCOLA:  That's it.

14            THE COURT:  Mr. Maione?

15            MR. MAIONE:  Your Honor, when would you anticipate

16   having oral argument because it's kind of tentative, but I'm

17   trying to firm up some plans to be in Italy the last two weeks

18   in September.

19            THE COURT:  Okay.  We're all apparently going to

20   Italy.  I'm going in October, so I'll pass you in the airport

21   terminal.  The issue is the downside of being a junior judge is

22   that you have everybody else's reject cases, so, or other

23   cases.  So I don't think it would be so soon that you need to

24   worry about your travel plans, and I'm also not sure we'll even

25   need oral argument.  I promise you if we do need it, we'll
```

H5NLLONC

1    schedule it with enough time to accommodate everyone's trips to

2    Italy.  I do appreciate you letting know me about that.

3             Anything else?

4             MR. MAIONE:  No.

5             MR. FIOCCOLA:  Nothing from us, your Honor.

6             THE COURT:  Thank you all very much.

7                              o0o

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25